State of CALIFORNIA; California Coastal Commission; Gray Davis, Governor; Bill Lockyer, Attorney General, Plaintiffs–Appellees,

and

Natural Resources Defense Council; League for Coastal Protection; Get Oil Out!; Citizens Planning Association of Santa Barbara; California Public Interest Research Group; Sierra Club; Friends of the Sea Otter; California Coastkeeper; Santa Barbara Channelkeeper; Santa Monica Baykeeper, Inc., Intervenors–Appellees,

and

Santa Barbara County; San Luis Obispo County, Intervenors–Appellees,

v.

Gale NORTON, Secretary of the Department of Interior; United States Department of the Interior Minerals Management Service; Regional Supervisor of the Minerals Management Service, Defendants–Appellants,

and

Aera Energy LLC; Conoco, Inc.; Nuevo Energy Company; Poseidon Petroleum, LLC; Samedan Oil Corp., Intervenors–Appellants.

State of California; California Coastal Commission; Gray Davis, Governor; Bill Lockyer, Attorney General, Plaintiffs–Appellees,

and

Natural Resources Defense Council; League for Coastal Protection; Get Oil Out!; Citizens Planning Association of Santa Barbara; California Public Interest Research Group; Sierra Club; Friends of the Sea Otter; California Coastkeeper; Santa Barbara Channelkeeper; Santa Monica Baykeeper, Inc., Intervenors–Appellees,

and

Santa Barbara County; San Luis Obispo County, Intervenors–Appellees,

v.

Gale Norton, Secretary of the Department of Interior; United States Department of the Interior Minerals Management Service; Regional Supervisor of the Minerals Management Service, Defendants–Appellants,

and

Aera Energy LLC; Conoco, INC.; Nuevo Energy Company; Poseidon Petroleum, LLC; Samedan Oil Corp., Intervenors–Appellants.

Nos. 01–16637, 01–16690.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 10, 2002.

Filed Dec. 2, 2002.

Thomas L. Sansonetti, Assistant Attorney General, Environment & Natl. Resources Div., David W. Shapiro, United States Attorney, James Coda, Assistant U.S. Attorney, Edward S. Geldermann, William B. Lazarus, David C. Shilton, U.S. Dept. of Justice, Washington D.C., Fred E. Ferguson, Peter J. Schaumberg, Geoffrey R. Heath, Office of the Solicitor, Department of the Interior, for the appellants.

E. Edward Bruce, Steven J. Rosenbaum, Gregory M. Williams, Covington & Burling, Washington D.C., for the intervenors-appellants.

Bill Lockyer, Attorney General of the State of California, Richard M. Frank, Chief Assistant Attorney General, J. Matthew Rodriquez, Senior Assistant Attorney General, Jamee Jordan Patterson, Supervising Deputy Attorney General, San Diego California, for the plaintiffs-appellees.

Stephen Shane Stark, County Counsel, Santa Barbara County, Alan Seltzer, Chief Deputy County Counsel, Santa Barbara County, William M. Dillon, Senior Deputy County Counsel, Santa Barbara County, Santa Barbara, California, James B. Lindholm, Jr., County Counsel San Luis Obispo County, Timothy McNulty, Deputy County Counsel, San Luis Obispo County, San Luis Obispo, California, for the County intervenors-appellees.

Linda Krop, Environmental Defense Center, Santa Barbara, California, Andrew Caputo, Natural Resources Defense Council, San Francisco, California, for the Environmental Group intervenors-appellees.

Before SCHROEDER, Chief Judge, D.W. NELSON and REINHARDT, Circuit Judges.

## OPINION

D.W. NELSON, Senior Circuit Judge.

Appellants ("United States")[1] granted "suspensions" of thirty-six oil leases off-

---

[1]. Numerous officers and agencies have acted on behalf of both the United States and California in these matters. Unless significance attaches to the fact that a particular officer or agency took a particular action, we refer to all those acting on behalf of the United States as "the United States," and all those acting on behalf of California as "California."

shore of central California pursuant to 43 U.S.C. § 1334(a)(1). The purpose of the lease suspensions was to extend the lives of the leases and to allow the lessees to "facilitate proper development of the lease[s]." 43 U.S.C. § 1334(a)(1). Without the suspensions, the leases would have expired and the lessees would have lost all production rights because the lessees had not begun production in paying quantities and the term of the leases had elapsed. *Id.*

Appellee ("California") asserted authority to review the lease suspensions for consistency with California's Coastal Management Program pursuant to the Coastal Zone Management Act, 16 U.S.C. §§ 1451–1465. California also objected to the lease suspensions on grounds that the United States failed to perform an environmental review of the lease suspensions pursuant to the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370f. The United States refused to submit the lease suspensions to California for review, claiming that lease suspensions are not subject to review by California under the terms of the Coastal Zone Management Act. The United States also asserted that the lease suspensions were categorically excluded from environmental review pursuant to NEPA.

California filed suit in federal district court seeking to enjoin the lease suspensions until it was afforded the opportunity to review them. California also sought to force the United States to prepare an Environmental Impact Statement ("EIS") before approving the lease suspensions. Ten environmental groups intervened as plaintiffs with California: Natural Resources Defense Council; League For Coastal Protection; Get Oil Out!; Citizens Planning Association of Santa Barbara; California Public Interest Research Group; Sierra Club; Friends of the Sea Otter; California CoastKeeper; Santa Barbara Channel-

keeper; and Santa Monica Bay Keeper, Inc. ("Environmental Groups"). The counties of Santa Barbara and San Luis Obispo ("Counties") also intervened as plaintiffs with California. The lessees intervened as defendants with the United States: Aera Energy, LLC; Conoco, Inc.; Nuevo Energy Company; Poseidon Petroleum, LLC; and Samedan Oil Corp. ("Oil Companies").

The district court held that the approval of the lease suspensions by the United States was subject to consistency review by California pursuant to 16 U.S.C. § 1456(c)(1)(A). *California ex rel. Cal. Coastal Comm'n v. Norton,* 150 F.Supp.2d 1046, 1057 (N.D.Cal.2001). The district court also held that the United States did not adequately document its reliance on the claimed categorical exclusion pursuant to NEPA and ordered the United States to provide an explanation for the applicability of the categorical exclusion to these lease suspensions. *Id.* The United States and the Oil Companies timely appealed.

We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

## I. Background
### A. The 1969 Santa Barbara Oil Spill

This case implicates California's ability to review and influence decisions of the federal government regarding oil drilling in federal waters off of California's coast. Our decision today necessarily involves a rather long and complex textual journey through an interwoven scheme of federal and State statutes and regulations. Before we embark, we briefly recollect the failures that these environmental protections are designed to prevent by providing for substantial State involvement in federal decisions concerning offshore oil drilling.

Five miles off the shore of the small beach town of Summerland, California, at 10:45 a.m. on Tuesday, January 28, 1969, crews on Union Oil Company offshore

Platform Alpha were pulling the drilling tube out of well A–21 in order to assess their progress. Mud began to ooze up from the depths through the well shaft, signaling that something had gone wrong below. Within minutes, tons of mud spewed out of the top of the well propelled by a blast of natural gas. Frantic platform workers quickly capped the well, but it was too late to stop the rushing rent of oil rising from 3,000 feet below the ocean floor. The unlined walls of the well shaft gave way and oil poured into the surrounding geological formation under the sea floor. As the pressure continued to build, the oil burst upward through the roof of the Venture Anticline, ripped five long gashes in the ocean floor, and rose 188 feet through the blue-green waters of the Santa Barbara channel. The flow continued at thousands of gallons per hour for more than a week, spreading a tar-black patch seaward over eight hundred square miles of ocean. A.E. Keir Nash et al., *Oil Pollution and the Public Interest: A Study of the Santa Barbara Oil Spill* 1–3 (1972); Keith C. Clark & Jeffrey J. Hemphill, *The Santa Barbara Oil Spill: A Retrospective* (paper given at the Association of Pacific Coast Geographers 64th Annual Meeting, Sept. 14, 2001) at http:// www.geog.ucsb.edu/-jeff/sb_69oilspill; *Battle Off Coast Slick Is Spreading—Planes Called In,* S.F. Chron., Feb. 1, 1969 at 1; *Oil Leak Presents Particularly Sticky Problem,* S.F. Chron., Feb. 2, 1969 at 5. *Futile Fight Against The Oil Slick,* S.F. Chron., Feb. 7, 1969 at 1; Nick Welsh, *The Big Spill,* The Santa Barbara Independent, Jan. 26, 1989.

Then on the evening of Tuesday, February 4, the wind shifted and blew hard onshore, driving the oil into Santa Barbara harbor and fouling thirty miles of beaches up and down the coast. *Futile Fight Against the Oil Slick.* For weeks on end "[a] dense acrid stench clung to the shoreline as a force of 1000 men—many of them prisoners—pitchforked tons of straw onto the stained sand and murky tide to soak up the mess." *Great Oil Slick Cleanup— The 'Impossible' Task,* S.F. Chron., Feb. 10, 1969 at 2. The cleanup efforts proved largely ineffective against the mass of oil, and thousands of sea birds were killed along with seals and other marine mammals. *See Oil Slick Killing Off Wild Life,* S.F. Chron., Feb. 2, 1969 at 1; *Oil Thickens on Beach—'Months of Work Ahead',* S.F. Chron., Feb. 6, 1969 at 1. By February 24, another well on Platform Alpha had blown out, and the oil-gushing fractures had spread over acres of ocean floor. County of Santa Barbara Planning and Development Energy Division, *Blowout at Union Oil's Platform A* at http://www.countyofsb.org/energy/information/1969blowout.asp.

The nation was confronted with an environmental disaster of unprecedented proportions that might have been avoided but for a failure of federal oversight. A federal regulator had approved Union Oil's request to waive safety requirements that called for well shafts to be lined with hardened casing to prevent just the type of accident that occurred. *Oil Pollution and the Public Interest* at 4. Secretary of the Interior Walter J. Hickel immediately accepted some measure of responsibility, *The Santa Barbara Oil Spill: A Retrospective* at 3, and the White House Council on Environmental Quality later acknowledged that "[t]he federal government had largely ignored the need to protect commercial, recreational, aesthetic, and ecological values of the area." *Id.*

In the aftermath of the spill, California Congressman John V. Tunney took to the well of the House to declare that "illplanned offshore oil drilling" was a manifestation of "centuries of careless neglect of the environment [that] have brought mankind to a final crossroads," and that

"the quality of our lives is eroded and our very existence threatened by our abuse of the natural world." 116 Cong. Rec. 498 (1970). President Richard Nixon personally viewed the damage and agreed that the Santa Barbara spill "frankly touched the conscience of the American people." *The Santa Barbara Oil Spill: A Retrospective* at 3.

### B. Statutory Background

As President Nixon aptly observed, the Santa Barbara spill changed the nation's attitudes towards the environment. Some would trace the current framework of environmental protections in substantial measure directly to the Santa Barbara spill. *See, e.g.,* Miles Corwin, *The Oil Spill Heard 'Round The Country'*, L.A. Times, Jan. 28, 1989. Of particular relevance here, the federal Coastal Zone Management Act and California's Coastal Act followed in the wake of the spill and both provided California substantial oversight authority for offshore oil drilling in federally controlled areas.

### 1. The Federal Coastal Zone Management Act

California's coastal zone includes coastal waters and adjacent shorelands, and extends three miles seaward from the State's coast line. 16 U.S.C. § 1453; 43 U.S.C. § 1312. In the Coastal Zone Management Act, Congress granted the coastal States the right to review "Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone," 16 U.S.C. § 1456(c)(1)(A), for consistency with the States' Coastal Management Programs. *See* 15 C.F.R. §§ 930.34–930.44 (1999).[2] If a State determines that a proposed federal activity is not consistent with that State's

Coastal Management Program and the United States disagrees, the State may seek mediation of the dispute, 15 C.F.R. § 930.44 (1999), or may seek relief in federal court, *see, e.g., Akiak Native Comty. v. United States Postal Serv.*, 213 F.3d 1140 (9th Cir.2000). Alternatively, coastal States have the right to review any "Federal license or permit" required for activities that affect the coastal zone. 16 U.S.C. § 1456(c)(3)(A). The differences between State review under these two sections are discussed in more detail at section IV(A)(1) *infra*.

### 2. The California Coastal Act

In 1972 the voters of California approved the California Coastal Zone Conservation Act by popular initiative. *CEEED v. Cal. Coastal Zone Conservation Comm'n*, 43 Cal.App.3d 306, 118 Cal.Rptr. 315, 319 (1974). Subsequently, the California legislature codified the protections of the initiative in the California Coastal Act of 1976. Cal. Pub. Res.Code § 30000–30900 (West 1996 & Supp.2002). The California Legislature declared that the California Coastal Act was "to provide maximum state involvement in federal activities allowable under federal law." Cal. Pub. Res.Code § 30004.

Acting under its authority pursuant to the California Coastal Act, the California Coastal Commission developed California's Coastal Management Program, as contemplated in the federal Coastal Zone Management Act. The federal government approved California's Coastal Management Program. *Am. Petroleum Inst. v. Knecht*, 456 F.Supp. 889, 893–94 (C.D.Cal.1978).

Thus, California is authorized by federal law to review specified federal activities

---

**2.** We refer to the regulations in effect at the time the lease suspensions were granted by indicating the year (1999) where the district court relied on those regulations in its decision.

for consistency with its Coastal Management Program.

### 3. The Outer Continental Shelf Lands Act

The Outer Continental Shelf begins at the outer boundary of the State's coastal zone (three miles out) and extends seaward. 43 U.S.C. § 1331(a). The Outer Continental Shelf Lands Act prescribes how off shore leases for the exploration and production of oil and gas in the Outer Continental Shelf will be administered. 43 U.S.C. § 1331–1356a. The term for off shore leases is set by statute at five to ten years. 43 U.S.C. § 1337(b)(2)(A) & (B). After the initial term of the lease elapses, the lease continues in effect so long as oil and gas are being produced in paying quantities or drilling operations are underway. *Id.* If production or approved drilling are not underway at the end of the term, the lease expires and the leaseholder loses rights to exploit resources in the lease area.

If the lessee is not able to begin production within the term of the lease, a procedure exists to avoid expiration of the lease and extend the lease term. These extensions are referred to as "suspensions." 43 U.S.C. § 1334(a)(1). The effect of a lease suspension is to extend the life of the lease and to allow the lessee to "facilitate proper development of a lease." *Id.* Lease suspensions may also be used to deal with environmental emergencies and other matters not at issue in this litigation.

### 4. The National Environmental Policy Act

Signed by President Nixon just months after the Santa Barbara spill, NEPA requires that federal agencies take a "hard look" at the environmental consequences of their actions. *Metcalf v. Daley*, 214 F.3d 1135, 1141 (9th Cir.2000). An agency must prepare NEPA documents before any irreversible and irretrievable commitment of resources is made. *Id.* at. Generally, the agency is required to prepare an IS or an Environmental Assessment ("EA") before committing resources to an action. A federal agency may adopt a "categorical exclusion" for a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. 1508.4 (2001). Generally, if an action falls within an adopted categorical exclusion the agency is not required to prepare an EIS or an EA. *Id.* However, an agency adopting a categorical exclusion must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.* In such extraordinary circumstances, a categorically excluded action would nevertheless trigger preparation of an EIS or an EA.

### C. The 36 Leases at Issue

The thirty-six leases that are the subject of this litigation were issued between 1968 and 1984. They have not yet begun producing paying quantities of oil or gas and would have expired but for previous suspensions. The latest round of suspensions, which are challenged in this lawsuit, were issued to prevent the leases from expiring in 1999. Within the boundaries of the leaseholds at issue, there have been thirty-eight exploratory wells drilled resulting in seventeen discoveries. The most recent well was drilled in 1989. The oil companies paid the United States approximately $1.25 billion for the leases. The leaseholds are located between the Channel Islands National Marine Sanctuary and the Monterey Bay National Marine Sanctuary, which contain many species that are particularly sensitive to the impacts of spilled oil. Most of the leaseholds are adjacent to Santa Barbara and San Luis Obispo Counties.

In May of 1999, the lessees submitted requests for suspensions of all thirty-six

leases.[3] Shortly thereafter, California informed the United States that it had determined to assert its authority under the Coastal Zone Management Act to review the lease suspensions for consistency with California's Coastal Management Plan. The United States responded that California had no authority to review the lease suspensions because the lease suspensions in and of themselves did not have the potential to affect the land or water use or natural resources of California's coastal zone. Despite California's objections, the United States granted the suspension requests for the thirty-six leases without providing California an opportunity for consistency review. California also objected to the lack of NEPA review of the lease suspensions.

California filed suit in federal district court alleging that the United States had failed to provide California with the opportunity to review the lease suspensions as required by the Coastal Zone Management Act and had failed to conduct required environmental review under NEPA.

## II. District Court Proceedings

### A. Federal Coastal Zone Management Act Claim

In the district court, California sought to enjoin the lease suspensions until it was afforded the opportunity to review the proposed suspensions for consistency. California advanced two alternative theories. First, California argued that the Oil Companies, in applying for the lease suspensions, were applicants "for a required Federal license or permit" to conduct an activity affecting the coastal zone within

the meaning of 16 U.S.C. § 1456(c)(3)(A). *California ex rel. Cal. Coastal Comm'n v. Norton,* 150 F.Supp.2d 1046, 1054–55(N.D.Cal.2001). Under this theory, the Oil Companies would be required to submit the proposed suspensions to California for review under the review regime prescribed by 16 U.S.C. § 1456(c)(3)(A). Alternatively, California argued that the United States' approval of the lease suspensions was a "Federal agency activity" affecting the coastal zone within the meaning of 16 U.S.C. § 1456(c)(1)(A). *Id.* at 1051. Under this theory, the United States would be required to submit the proposed suspensions to California for review under the somewhat different review regime triggered by 16 U.S.C. § 1456(c)(1)(A).

The district court held that the approval of the lease suspensions by the United States was a federal agency activity subject to consistency review by California pursuant to 16 U.S.C. § 1456(c)(1)(A). *Cal. Coastal Comm'n v. Norton,* 150 F.Supp.2d at 1053. The district court did not reach California's alternative claim that the requests for lease suspensions by the oil companies were applications for a required federal license or permit. The district court set aside the United States' approval of the lease suspensions requested by the oil companies, and ordered that the United States "direct"[4] suspension of the leases for a time sufficient to provide California with a consistency determination. *Id.* at 1057–58.

### B. NEPA Claim

In the district court, California sought to force the United States to prepare an EIS

---

**3.** The record shows suspension requests for forty leases. Subsequently four of the leases were determined not to be eligible for further suspension and expired on August 16, 1999, reducing the number of leases at issue to thirty-six. The holders of the four leases administratively challenged the expiration of

their leases. As of the filing of briefs in this appeal, the challenges were pending.

**4.** The suspension of a lease may be either "granted" at the request of the lessee or "directed" on the initiative of the United States. 30 C.F.R. 250.110 (1999).

or an EA before approving any lease suspensions. *Id.* at 1056. California argued that environmental documentation was required because circumstances had changed since the original leases had been granted and since earlier environmental documentation had been prepared assessing the expected impacts of exploration and drilling activity on the leaseholds. *Id.* Among the changed circumstances cited by California was the expansion of the territory of the threatened sea otter towards the lease area. *Id.*

California also argued that the United States improperly relied upon the categorical exclusion for lease suspensions. *Id.* The parties do not dispute that the United States properly adopted a categorical exclusion from the requirement for environmental documentation for lease suspensions pursuant to 40 C.F.R. § 1508.4. However, 40 C.F.R. § 1508.4 requires that an agency adopting a categorical exclusion "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." When extraordinary circumstances are present, the agency must prepare environmental documentation despite the fact that the activity in question falls within a categorical exclusion.

The district court held that the United States failed to provide a reasoned explanation for its reliance on the categorical exclusion and failed to explain the inapplicability of the extraordinary circumstances exceptions to the lease suspensions. *Id.* at 1057. The district court held that the United States could not rely on the categorical exclusion without providing these explanations and ordered the United States to provide both of these explanations. It held that the United 18 States was not required to prepare an EIS or an EA "at this time." *Id.*

### III. Standard of Review

We review a grant of summary judgment *de novo. Akiak Native Comty.*, 213 F.3d at 1144.

Judicial review of actions under the Coastal Zone Management Act and NEPA ordinarily is governed by the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706. *Akiak Native Comty.*, 213 F.3d at 1144. Pursuant to the Administrative Procedure Act, agency decisions shall be set aside if "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

### IV. Discussion

#### A. Coastal Zone Management Act Claims

##### 1. The Difference Between Consistency Review Pursuant To 16 U.S.C. § 1456(c)(3) and 16 U.S.C. § 1456(c)(1)

Section (c)(1) provides for consistency review for federal agency activities. Section (c)(3) provides for consistency review for federal licenses or permits. Sections (c)(1) and (c)(3) are mutually exclusive because section 1456(c)(1)(A) provides that an "activity shall be subject to this paragraph unless it is subject to paragraph (2) or (3)."

Under (c)(1) review, the federal agency makes a "consistency determination" and submits it to the State. Under (c)(3) review, the applicant for the license or permit prepares a "consistency certification," which is submitted to the State.

In its California Undeveloped Leases Briefing Book, dated Nov. 2, 1999, the Minerals Management Service describes the respective requirements of (c)(1) and (c)(3) review. Section (c)(1) review is described as follows, using a lease sale as an example of a federal agency activity:

States review OCS lease sales for Federal consistency. The MMS [Minerals

Management Service] describes how the sale is consistent "to the maximum extent practicable" with the Program's enforceable policies in a "consistency determination." Each affected State must agree with or disagree with the consistency determination within a designated time period. If the State agrees, MMS can hold the lease sale. If the State disagrees, it must describe the inconsistency and any alternative measures that would allow the sale to be consistent to the maximum extent practicable with the Program's enforceable policies. The CZMA [Coastal Act] allows MMS to proceed with the lease sale notwithstanding any unresolved disagreements or MMS can ask NOAA [National Oceanic and Atmospheric Administration] for mediation to work out differences.

If the State is dissatisfied with the agency's resolution of the issues, it may seek judicial review in federal district court. Notwithstanding any determination by a court that a federal agency activity is not in compliance with a State's Coastal Management Program, the President may exempt from compliance those elements of the federal agency activity that are found by the federal court to be inconsistent. 16 U.S.C. § 1456(c)(1)(B).

The briefing book goes on to detail the review procedure under section (c)(3) for exploration and development and production plans. It explains that review of permits[and licenses] is similar:

> States review OCS exploration and development and production plan (Plans) for Federal consistency. The OCS lessee prepares a "consistency certification" that is submitted to us when filing the proposed Plan. We send a copy of the Plan and certification to the affected States for Federal consistency review

and decision. Each State decides whether the Plan is consistent with enforceable policies of its Program. The State must concur with or object to the lessee's consistency certification within a designated time period. If the State does not meet the deadline, CZMA provisions render the Plan consistent ("conclusively presumed"). If the State concurs, we approve the plan and the lessee can begin activities. If the State objects, we are prohibited from approving the plan and ·

> 1. the lessee can appeal the State's decision to the Department of Commerce or
>
> 2. the lessee can amend the plan and resubmit it to MMS for approval and to the State for Federal consistency review.

Before deciding issues on administrative appeal, the Secretary of Commerce must provide for "reasonable opportunity for detailed comments from the Federal agency involved and from the state." 16 U.S.C. § 1456(c)(3)(A).

> *2. Approval Of The 36 Lease Suspensions Is A Federal Agency Activity Requiring Submission of A Consistency Determination To California For Review Pursuant To 16 U.S.C. § 1456(c)(1)(A)*

16 U.S.C. § 1456(c)(1)(A) requires that the United States must allow California to review the consistency of "[e]ach Federal agency activity within or outside the coastal zone that affects any land or water use or natural resource of the coastal zone." 16 U.S.C. § 1456(c)(1)(A).

The United States does not dispute that activities that will ultimately take place under the extended leases will affect the natural resources of the coastal zone.[5] The United States also does not dispute that approval of lease suspensions is a

---

5. The United States does argue that the lease

suspensions prohibit operations on the leases

federal agency activity within the meaning of the statute. However, the United States argues that reviewing the lease suspensions for consistency would be duplicative, because any activities that take place under the extended terms of the leases will themselves be reviewed for consistency when exploration plans or development and production plans are approved. The United States points out that any exploration activities must be preceded by submission of an exploration plan. 43 U.S.C. § 1340(e)(2). These plans are formal documents that must be submitted to California for consistency review. 16 U.S.C. § 1456(c)(3)(B); 43 U.S.C. § 1340(c)(2). Once oil or gas is discovered, a development and production plan must also be submitted before production commences and the development nd production plan must also be submitted to California for consistency review. 16 U.S.C. § 1456(c)(3)(B); 43 U.S.C. § 1351(d).

The United States argues that California seeks repeated and duplicative reviews: once when the lease is suspended and then again when each activity affecting the coastal zone is approved in exploration plans or development and production plans. The United States asserts that this duplicative review is contrary to congressional intent. On the United States' view, Congress expressly barred repeated or duplicative review of activities described in exploration plans or development and production plans.

■ Congress did mandate that once an exploration plan or development and pro-

duction plan is submitted to California and found to be consistent with California's Coastal Management Plan, the subsidiary licenses and permits needed to carry out the activities specifically described in the plan are not themselves subject to another round of consistency review. 16 U.S.C. § 1456(c)(3)(B). From this, the United States goes on to extrapolate that federal agency activities antecedent and prerequisite to exploration and development and production plans (i.e., the lease suspensions) could not logically be subject to consistency review because consistency review occurs once, and once only—at the exploration and development and production plan stage.

However, it does not follow that lease suspensions, which are not subsidiary to exploration and development and production plans, are not subject to consistency review. In fact, the same extrapolation used here by the United States—that because activities following exploration and development and production plans are not subject to consistency review, those activities preceding the plans aren't either—has been specifically rejected by Congress.

In 1984, the Supreme Court held that a lease sale (the original sale of the lease as opposed to the lease extensions at issue here) was not subject to consistency review by California. *Sec'y of the Interior v. California*, 464 U.S. 312, 343, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984). In reaching this decision, the Supreme Court held that specific activities affecting the coastal zone

---

during the term of the suspension, so the suspensions do not immediately affect the coastal zone because no operations will take place during the term of the suspension. We disagree. The lease suspensions require the lessees to achieve a list of "milestones" during the suspension period. The milestones include completing a 3D seismic survey using underwater explosives that may permanently injure marine mammals. The survey will also

affect fishing in the area and may require compensation to fishers for loss of income. The milestones further require drilling of wells during the suspension period, albeit on the last day of the suspension. The suspensions *require* the lessees to perform these milestone activities and therefore the suspensions do immediately affect the coastal zone within the suspension period.

would be reviewed at the exploration plan or development and production plan stage and that Congress intended to limit State consistency review to these later two phases of offshore oil and gas development. *Id.* at 337, 104 S.Ct. 656. In 1990, Congress amended the statute specifically "to overturn the decision of the Supreme Court in *Secretary of the Interior v. California,* 464 U.S. 312, 104 S.Ct. 656, 78 L.Ed.2d 496 (1984), and to make clear that Outer Continental Shelf oil and gas lease sales are subject to the requirements of section 307(c)(1) [16 U.S.C. § 1456(c)(1)]." H.R. Conf. Rep. No. 01–508 at 970 (1990). In subjecting lease sales to consistency review, Congress has made it clear that the statute does not prohibit consistency review of federal agency activities that are not subsidiary to exploration and development and production plans. The exploration plan and development and production plan stages are *not* the only opportunities for review afforded to States under the statutory scheme.

In determining that these lease suspensions are subject to review, we note that the leases at issue have *never* been reviewed by California. Because these leases were issued prior to 1990, when Congress amended the statute to make clear that lease sales are subject to consistency review, California was not afforded an opportunity to review the leases. These lease suspensions represent a significant decision to extend the life of oil exploration and production off of California's coast, with all of the far reaching effects and perils that go along with offshore oil production.[6] As the Counties point out, all but one of the lease sales for these leaseholds predate the approval of California's Coastal Management Plan. One of the leases dates back all the way to 1968. Subsequent to the sale of the leases, the Counties have enacted policies regarding oil transportation that have in turn been certified by the California Coastal Commission. The leases have never been reviewed for consistency with these policies. The Environmental Groups point out that numerous other factors have changed since the leases were sold, including the expansion in the range of the threatened sea otter toward the lease area and the creation of the Monterey Bay Marine Sanctuary.

Based on the foregoing, we affirm the district court's decision that the suspensions of these thirty-six leases are subject to consistency review pursuant to 16 U.S.C. § 1456(c)(1)(A).[7]

---

**6.** We reject the United States' argument that these lease suspensions do not grant new rights or authority and are merely ministerial. Federal regulations provide that "[t]he Regional Supervisor *may,* on the Regional Supervisor's initiative or at the request of the lessee, suspend or temporarily prohibit production or any other operation or activity on all or any part of a lease (suspension) when the Regional Supervisor determines that such suspension is in the national interest." 30 C.F.R. § 250.110(a) (1999) (emphasis added). The use of the permissive "may" indicates that the determination is discretionary. Moreover, determining what is in the "national interest" must of necessity involve the exercise of judgment and implicates policy choices. Because the decision to extend these

leases through the suspension process is discretionary, it does grant new rights to the lessees to produce oil and derive revenues therefrom for many years when absent the suspensions all rights would have terminated. We note that the regulations have recently been revised. However, we agree with the United States that the 1999 regulation quoted above is applicable to the suspensions in this case.

**7.** We are not persuaded by the United States' alternative argument that it has already complied with consistency review requirements by providing a "negative determination" to California. The record indicates that the documents cited by the United States do not meet the requirements of a negative determination

Although California provides arguments in the alternative for review pursuant to 16 U.S.C. § 1456(c)(3)(A), California acknowledges in its brief that the district court properly found that review should be under 16 U.S.C. § 1456(c)(1)(A). The Environmental Groups also provide stop-gap alternative arguments for review under 16 U.S.C. § 1456(c)(3)(A); however, they acknowledge that the lease suspensions should be reviewed under section (c)(1) rather than (c)(3). At oral argument, California and the Environmental Groups confirmed that it is their position that section (c)(1) is the applicable provision. For their part, the Oil Companies devote their entire brief to the proposition that section (c)(3) is not applicable. Although they mention in a footnote that they do not concede the applicability of section (c)(1), they provide no argument to refute the applicability of section (c)(1).

We note that Congress specifically subjected lease sales to section (c)(1). Although a lease suspension is not identical to a lease sale, the very broad and long term effects of these suspensions more closely resemble the effects of a sale than they do the highly specific activities reviewed under section (c)(3). We also note that for some of the leases being extended new exploration plans will be issued and these plans will be subject to section (c)(3) review. For other leases, existing exploration plans will be revised, which may also trigger section (c)(3) review.[8] Thus, section (c)(3) review will be available to California at the appropriate time for specific individual new and revised plans as they arise, and section (c)(1) review is available now for the broader effects implicated in suspending the leases. This phasing of review fits closely the expressed intent of Congress in subjecting the analogously broad implications of lease sales to (c)(1) review and specific plans to (c)(3) review.

We are therefore convinced that section (c)(1) applies to these lease suspensions. Because sections (c)(1) and (c)(3) are mutually exclusive, (c)(3) does not apply. We have before us today only leases that were issued prior to the 1990 Coastal Zone Management Act amendments, which have never been subject to consistency review. Accordingly, we need only decide the lease suspension question with respect to such

---

and do not serve this function. We agree with the reasoning of the district court with regard to the letter of August 13, 1999. *See Cal. Coastal Comm'n v. Norton*, 150 F.Supp.2d at 1054. Moreover, the United States acknowledges that the letter of August 13 was directed at a different batch of lease suspensions not at issue in this litigation. As to the letter of June 25, 1999, we conclude that this letter fails to analyze the facts pertinent to these suspensions and effectively states that a lease suspension can never trigger State review. However, we agree with the reasoning of the National Oceanic and Atmospheric Administration that a lease suspension or set of lease suspensions might "affect the uses or resources of the State's coastal zone, and thus CZMA bars ... categorically exempting suspensions from consistency [review]." Coastal Zone Management Act Federal Consistency Regulations, 65 Fed. Reg. 77124, 77144 (Dec. 8, 2000). "Whether

a particular federal action affects the coastal zone is a factual determination" to be made on a "case-by-case" basis. 65 Fed.Reg. 77124, 77125. The United States' approach in the letter of June 25, therefore fails to provide the required fact-specific inquiry necessary for a negative determination.

8. Revised exploration plans are subject to section (c)(3) review if activities approved in the plan cause coastal zone effects "substantially different" from those reviewed in the original plan. 15 C.F.R. § 930.51(b)(3) (2002). In determining whether a revised plan causes "substantially different" coastal effects triggering (c)(3) review, "[t]he opinion of the State agency shall be accorded deference and the term[ ] ... 'substantially different' shall be construed broadly to ensure that the State agency has the opportunity to review activities and coastal effects not previously reviewed." 15 C.F.R. § 930.51(e).

leases. We reserve determination of California's right to review a lease suspension affecting a lease that was itself subject to consistency review for decision on the particular facts of such a case if it should ever come before us.

### B. National Environmental Policy Act Claims

NEPA requires that federal agencies take a "hard look" at the environmental consequences of their actions. *Metcalf,* 214 F.3d at 1141. An agency must prepare NEPA documents before any irreversible and irretrievable commitment of resources is made. *Id.* at 1143. Generally, the agency is required to prepare an EIS or an EA before committing resources to an action. A federal agency may adopt a "categorical exclusion" for a "category of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. 1508.4 (2001). Generally, if an action falls within an adopted categorical exclusion the agency is not required to prepare an EIS or an EA. *Id.* However, an agency adopting a categorical exclusion must "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." *Id.*

The United States has adopted a categorical exclusion for lease suspensions. National Environmental Policy Act; Implementing Procedures for Minerals Management Service, 51 Fed.Reg. 1855, 1857 (Jan. 15, 1986). The United States has also adopted a list of ten exceptions to the categorical exclusion for lease suspensions. National Environmental Policy Act; Revised Implementing Procedures, 49 Fed. Reg. 21437, 21439 (May 21, 1984).

The United States did not prepare environmental documentation regarding its decision to approve the lease suspensions. The United States argues that no environmental documentation was required be-cause lease suspensions are categorically excluded and none of the exceptions to the exclusion apply in this case.

The Environmental Groups argue that the United States cannot rely on the categorical exclusion because the United States did not make a categorical exclusion determination at the time it granted the lease suspensions. The implication is that the United States is using the categorical exclusion as a post hoc rationalization when in fact it simply failed entirely to consider the potential environmental consequences of its decision at the time the decision was made. This would frustrate the fundamental purpose of NEPA, which is to ensure that federal agencies take a "hard look" at the environmental consequences of their actions, *Muckleshoot Indian Tribe v. United States Forest Serv.,* 177 F.3d 800, 814 (9th Cir.1999), early enough so that it can serve as an important contribution to the decision making process. *Metcalf,* 214 F.3d at 1142–43.

The United States does not point to any documentation in the record that would suggest that it made a categorical exclusion determination at the time the lease suspensions were approved. Instead it argues that the lease suspensions are indeed categorically exempt and that none of the exceptions applies. The United States argues that this Court can rely on the existing record to determine that the lease suspensions are categorically exempt because it is evident from the record that the duly-promulgated categorical exclusion for lease suspensions applies here. The United States cites as precedent for such a review procedure the decision of this Court in *Bicycle Trails Council of Marin v. Babbitt,* 82 F.3d 1445(9th Cir.1996).

*Bicycle Trails,* however, severely undermines the United States' argument. In *Bicycle Trails* the National Park Service relied on a categorical exclusion to exclude

promulgation of rules governing bicycle use from NEPA review. This Court upheld the action of the Park Service as a proper invocation of the categorical exclusion. However, the Park Service made specific findings of fact and systematically applied its regulations for categorical exclusions to those facts in a Record of Decision contemporaneously published in the Federal Register. *Bicycle Trails*, 82 F.3d at 1456–57. Here, the United States points to no record of decision invoking a categorical exclusion, even in a cursory fashion.

■■■ *Bicycle Trails* summarizes the requirement for an agency to apply a categorical exclusion: "An agency satisfies NEPA if it applies its categorical exclusions and determines that neither an EA nor an EIS is required, so long as the application of the exclusions to the facts of the particular action is not arbitrary and capricious." *Bicycle Trails*, 82 F.3d at 1456 n. 5. It is difficult for a reviewing court to determine if the application of an exclusion is arbitrary and capricious where there is no contemporaneous documentation to show that the agency considered the environmental consequences of its action and decided to apply a categorical exclusion to the facts of a particular decision. Post hoc invocation of a categorical exclusion does not provide assurance that the agency actually considered the environmental effects of its action before the decision was made. District courts in our circuit have set aside agency decisions in similar circumstances on this reasoning. *See, e.g., Comm. For Idaho's High Desert v. Collinge*, 148 F.Supp.2d 1097, 1103 (D.Idaho 2001).

In many instances, a brief statement that a categorical exclusion is being invoked will suffice. Here, concern for adequate justification of the categorical exclusion is heightened because there is substantial evidence in the record that ex-

ceptions to the categorical exclusion are applicable. Exception 2.8 disallows use of the categorical exclusion where the agency action may "[h]ave adverse effects on species listed or proposed to be listed on the list of Endangered or Threatened Species, or have effects on designated Critical Habitat for these species." 49 Fed.Reg. at 21439. The Chair of the California Coastal Commission wrote to the United States expressing concern over the effects of the lease suspensions on the threatened southern sea otter. Exception 2.2 disallows use of the categorical exclusion where the agency action may have adverse effects on "ecologically significant or critical areas." *Id.* The Chair of the California Coastal Commission also expressed concern that the approval of the lease suspensions could impact the Monterey Bay National Marine Sanctuary and the Channel Islands National Marine Sanctuary. Both of California's United States Senators also wrote expressing concern about impacts on the marine sanctuaries.

Exception 2.3 disallows use of categorical exclusions for actions which may "[h]ave highly controversial environmental effects." *Id.* The environmental effects of the leases are the subject not only of scientific, but also of public controversy. California Governor Gray Davis and United States Senator Dianne Feinstein both wrote on behalf of the people of California to express strong opposition to suspension of the leases because of concern over environmental effects. Senator Feinstein summed up the highly controversial environmental effects of offshore oil exploitation and the attitudes of Californians shaped by the 1969 spill in a letter dated June 16, 1999, to Secretary of the Interior Bruce Babbitt:

> In 1969 an oil spill in federal waters off the coast of Santa Barbara killed thousands of birds, as well as dolphins,

seals and other animals. Estimates of the amount of oil released range up to 200,000 barrels. Within days, oil spread from California's Channel Islands to the Mexican border, an area of approximately 800 square miles.

The people of California were so concerned that shortly thereafter they voted to create the California Coastal Commission. There was also a nationwide impact—a new movement towards stronger environmental protections, including the National Marine Sanctuaries Act.

Since the 1969 spill, there have been more than thirty additional significant oil spills off the California coast. Each spill has imperiled the environment, the economy, and the beautiful landscape of California. California's offshore currents are such that our coast should not be explored or developed any more.

In this case, additional exploration and development of offshore oil sources is not only risky, but is not necessary. The oil that will be produced under these leases is low quality, and limited in use. It is not worth gambling with one or our most precious national resources.

. . .

There is widespread agreement that oil drilling presents environmental dangers, and I urge you to terminate these leases without any further extensions.

Governor Davis has repeatedly and publicly stated that since the oil spills of 1969 Californians have vehemently opposed offshore drilling and that he would fight on behalf of California against new drilling on undeveloped federal leases. That there has been continuous and significant public controversy over the environmental effects of offshore oil activities in California for the past thirty years, and that there is significant public controversy over these lease extensions in particular is beyond debate.[9]

At the very least there is substantial evidence in the record that exceptions to the categorical exclusion *may* apply, and the fact that the exceptions may apply is all that is required to prohibit use of the categorical exclusion. 49 Fed.Reg. at 21439.

■ Where there is substantial evidence in the record that exceptions to the categorical exclusion may apply, the agency must at the very least explain why the action does not fall within one of the exceptions. In *Jones v. Gordon*, 792 F.2d 821 (9th Cir.1986), this Court held that a federal agency improperly relied on a categorical exclusion where the record revealed "the arguable existence of public controversy based on potential environmental consequences." *Id.* at 828(internal quotations omitted). In *Jones*, there were public comments in the record opposing the issuance of a permit to capture killer whales, including comments relating to the environmental effects of capturing whales. *Jones* held that the agency's invocation of a categorical exclusion was improper because the agency did not explain why an exception for actions involving public controversy based on potential environmental effects had no application. *Id.* at 826–29. There are subtle differences in wording between the exception in *Jones* and Exception 2.3 here. However, the existence of public controversy in this case is beyond doubt and the principle applied in *Jones* is fully applicable here.

Although California, the Counties, and the Environmental Groups argue that the categorical exclusion cannot be applied to these lease suspensions and an EIS is required, they do not ask us to modify the

---

**9.** Here, too, the United States argues that the lease suspensions cause no effects so the exceptions cannot apply, public controversy notwithstanding. We disagree. *See supra* note 5 and accompanying text.

decision of the district court, but rather urge that we affirm in all respects. The district court held that the United States must provide a reasoned explanation for its reliance on the categorical exclusion, including an explanation of why the exceptions do not apply. The district court left open the possibility of requiring an Environmental Impact Statement if the United States fails to provide an adequate explanation. We affirm the decision of the district court with respect to the NEPA claim, and leave it to the district court to determine in due course what, if any, further NEPA documentation is required.

## CONCLUSION

For the above stated reasons, we **AFFIRM** the decision of the district court with respect to both the NEPA and Coastal Zone Management Act claims and **REMAND** for further proceedings consistent with this opinion.

**AFFIRMED AND REMANDED.**