# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SIERRA CLUB; SIERRA NEVADA
FOREST PROTECTION CAMPAIGN,
        *Plaintiffs-Appellants,*

v.

DALE BOSWORTH, Chief of the US
Forest Service; JOHN BARRY;
LAURIE TIPPIN; UNITED STATES
FOREST SERVICE; ANN M.
VENEMAN; DEPT. OF AGRICULTURE;
MIKE JOHANNS,
        *Defendants-Appellees.*

No. 05-16989

D.C. No.
CV-04-02114-GEB

OPINION

Appeal from the United States District Court
for the Eastern District of California
Garland E. Burrell, District Judge, Presiding

Argued and Submitted
April 16, 2007—San Francisco, California

Filed December 5, 2007

Before: David R. Thompson, Andrew J. Kleinfeld, and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Thompson;
Concurrence by Judge Kleinfeld

15927

**COUNSEL**

Eric. E. Hubner, Boulder, Colorado, and Kristin Henry, San Francisco, California, for the plaintiffs-appellants.

MacGregor W. Scott, Sacramento, California, for defendants-appellees.

---

**OPINION**

THOMPSON, Senior Circuit Judge:

Appellants the Sierra Club and the Sierra Nevada Forest Protection Campaign (collectively, "Sierra Club") appeal the district court's summary judgment in favor of the United States Forest Service and Department of Agriculture (collectively, "Forest Service"), in their action alleging that the defendants violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321-4370f. The Sierra Club challenges the Forest Service's establishment of a NEPA categorical exclusion ("Fuels CE") for all fuel reduction projects up to 1,000 acres and prescribed burn projects up to 4,500 acres on all national forests in the United States.

We conclude that the Forest Service failed to assess properly the significance of the hazardous fuels reduction categorical exclusion and thus it failed to demonstrate that it made a "reasoned decision" to promulgate the Fuels CE based on relevant factors and information. Accordingly, its promulgation of the Fuels CE was arbitrary and capricious. *See Marsh v. Or. Natural Res. Council*, 490 U.S. 360, 378 (1989); *see also* 40 C.F.R. § 1505.1. We reverse the district court's summary judgment in favor of the Forest Service and remand this case for further proceedings as hereafter set forth.

## I    Background

## A.    Statutory and Regulatory Framework

NEPA is a procedural statute that does not "mandate particular results, but simply provides the necessary process to ensure that federal agencies take a hard look at the environmental consequences of their actions." *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1070 (9th Cir. 2002) (internal quotation marks omitted). To carry out the "hard look" requirement, NEPA requires all federal agencies to prepare a detailed Environmental Impact Statement ("EIS") for "every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under CEQ implementing regulations, an agency as a preliminary step may prepare an Environmental Assessment ("EA") to determine whether the environmental impact of the proposed action is significant enough to warrant an EIS. *See* 40 C.F.R. § 1508.9; *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). If an EA establishes that the agency's action "*may* have a significant effect upon the . . . environment, an EIS must be prepared." *Id.* (internal quotation marks omitted) (alteration in original) (emphasis in original). If the proposed action is found to have no significant effect, the agency must issue a finding to that effect (a "FONSI"), "accompanied by a convincing statement of reasons to explain why a project's impacts are insignificant." *Id.* (internal quotation marks omitted).

However, an agency does not have to prepare an EIS or an EA if the action to be taken falls under a categorical exclusion ("CE"). *Alaska Ctr. for the Env't v. U.S. Forest Serv.*, 189 F.3d 851, 853-54 (9th Cir. 1999) (citing 40 C.F.R. § 1508.4). "Pursuant to Council of Environmental Quality (CEQ) regulations, each agency is required to identify categories of actions which do not individually or cumulatively have a significant effect on the human environment." *Id.* (citing 40 C.F.R.

§§ 1507.3(b)(2)(ii), 1508.4). The CE procedures developed by agencies "shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect," 40 C.F.R. § 1508.4, in which case an EIS or an EA/FONSI would be required.

## B. Fuels Categorical Exclusion

The Forest Service developed the Fuels CE in response to the Healthy Forests Initiative, announced by President Bush on August 22, 2002. National Environmental Policy Act Documentation Needed for Fire Management Activities; Categorical Exclusions, 67 Fed. Reg. 77038, 77039 (Dec. 16, 2002) (codified at Forest Service Handbook 1909.15, ch. 30, § 31.2 (10) (2004) (hereinafter, "FSH")). The Healthy Forests Initiative directed "the Departments of Agriculture and Interior and the Council on Environmental Quality to improve regulatory processes to ensure more timely decisions, greater efficiency, and better results in reducing the risk of catastrophic wildfires by restoring forest health." *Id.* The Healthy Forests Initiative was prompted by the year 2000 fire season, which was one of the worst in 50 years, with 123,000 fires burning more than 8.4 million acres, more than twice the 10-year national average. *Id.*

The Deputy Chief of the Forest Service announced on September 11, 2002, his intention to establish a categorical exclusion for fuels reduction activities on national forests, and requested data regarding fuels treatment projects from all Regional Foresters. The data call generated for the Fuels CE surveyed 2,500 hazardous fuels reduction and rehabilitation/ stabilization projects involving treatment of more than 2,500,000 acres. On December 16, 2002, the Forest Service gave public notice of and requested comment on the proposed Fuels CE. 67 Fed. Reg. at 77038. The Forest Service received 39,000 comments on the Fuels CE, National Environmental Policy Act Documentation Needed for Fire Management Activities; Categorical Exclusions, 68 Fed. Reg. 33814,

33815 (June 5, 2003), and published the final Fuels CE on June 5, 2003, *id.* at 33814.

The Fuels CE is designed to reduce and thin hazardous fuels, which are "combustible vegetation (live or dead), such as grass, leaves, ground litter, plants shrubs, and trees, that contribute to the threat of ignition and high fire intensity and/ or high rate of spread." 67 Fed. Reg. at 77040. "Hazardous fuels reduction involves manipulation, including combustion or removal of fuels, to reduce the likelihood of ignition and/ or to lessen potential damage to the ecosystem from intense wildfire and to create conditions where firefighters can safely and effectively control wildfires." *Id.* at 77040-41. The Fuels CE encompasses "[h]azardous fuels reduction activities using prescribed fire, not to exceed 4,500 acres, and mechanical methods for crushing, piling, thinning, pruning, cutting, chipping, mulching, and mowing, not to exceed 1,000 acres." FSH § 1909.15, ch. 30, §31.2 (10).[1] Any project proposed under

---

[1]The complete hazardous fuels reduction category is, as follows:

[h]azardous fuels reduction activities using prescribed fire, not to exceed 4,500 acres, and mechanical methods for crushing, piling, thinning, pruning, cutting, chipping, mulching, and mowing, not to exceed 1,000 acres. Such activities:

a.  Shall be limited to areas:

    (1) In the wildland-urban interface; or

    (2) Condition Classes 2 or 3 in Fire Regime Groups I, II, or III, outside the wildland-urban interface;

b.  Shall be identified through a collaborative framework as described in "A Collaborative Approach for Reducing Wildland Fire Risks to Communities and Environment 10-Year Comprehensive Strategy Implementation Plan";

c.  Shall be conducted consistent with agency and Departmental procedures and applicable land and resource management plans;

d.  Shall not be conducted in wilderness areas or impair the suitability of wilderness study areas for preservation as wilderness; and

the Fuels CE requires a project file and decision memo, consisting of a description of the categorically excluded project, the reasons for invoking the CE, a finding that no extraordinary circumstances exist, and a description of the public involvement. *Id.*

The Fuels CE calls for projects to be identified and prioritized under the Secretary of the Interior and the United States Department of Agriculture's ("USDA") "10-Year Comprehensive Strategy Implementation Plan."[2] 67 Fed. Reg. at 77042. The 10-Year Plan calls for collaboration at the local, tribal, State and Federal levels, with the amount of collaboration to be "consistent with the complexity of land ownership patterns, resource management issues, and the number of interested stakeholders." *Id.*

The Fuels CE was preceded by another significant change to the Forest Service Handbook, the addition of language in the extraordinary circumstances section which permits an action to proceed under a CE even when a listed resource condition exists.[3] Clarification of Extraordinary Circumstances

---

e.  Shall not include the use of herbicides or pesticides or the construction of new permanent roads or other new permanent infrastructure; and may include the sale of vegetative material if the primary purpose of the activity is hazardous fuels reduction.

Forest Service Handbook 1909.15, ch. 30, § 31.2 (10) (2004).

[2]The 10-Year Plan was developed in response to Congress's direction in October 2000 that the Departments of Agriculture and the Interior develop a ten-year strategy for implementing the National Fire Plan, and to do so in collaboration with the states most affected by fire. *See* Department of the Interior and Related Agencies Appropriations Act of 2001, 106 Pub. L. No. 291, 114 Stat. 922, 1008-1010 (Oct. 11, 2000) (requesting agencies to prepare a strategic plan detailing their plans to use the nearly $1 billion appropriated to address wildland fire danger, and to investigate the possibility of expedited NEPA compliance procedures).

[3]The previous Forest Service Handbook, adopted in 1992, required that "a proposed action may be categorically excluded from documentation in

for Categories of Actions Excluded From Documentation in an Environmental Assessment or an Environmental Impact Statement, 67 Fed. Reg. 54622, 54627 (Aug. 23, 2002). Old Forest Service guidance stated that examples of extraordinary circumstances included, but were not limited to, the presence of the following factors: steep slopes or highly erosive soils; threatened and endangered species or their critical habitat; flood plains, wetlands, or municipal watersheds; Congressionally designated areas, such as wilderness, wilderness study areas, or National Recreation Areas; inventoried roadless areas; Research Natural Areas; and Native American religious or cultural sites, archaeological sites, or historic properties or areas. FSH § 1909.15, ch. 30, § 31.2 (2) (1992); *see also* Dep't of Agric., National Environmental Policy Act; Revised Policy and Procedures, 57 Fed. Reg. 43180, 43208 (Sept. 18, 1992).

Now, however, these factors are "resource conditions that should be considered" to determine whether extraordinary circumstances exist, but do not require any particular result. FSH § 1909.15, ch. 30, § 30.3 (2) (2007). The new Handbook grants the Forest Service discretion to determine when an extraordinary circumstance exists, because it provides that "the mere presence of one or more of these resource conditions does not preclude use of categorical exclusions." *Id.* Whereas the old Handbook called for production of an EA when one of these conditions was present, the new guidelines call for a preliminary analysis to determine whether there exists "a cause-effect relationship between a proposed action and the potential effect on these resource conditions and [ ] if

_____

an environmental impact statement (EIS) or environmental assessment (EA) only if the proposed action . . . [i]s within a category listed in sec. 31.1b or 31.2; and there are no extraordinary circumstances related to the proposed action." Forest Service Handbook § 1909.15.30.3(2) (1992); *see also* Dep't of Agric., National Environmental Policy Act; Revised Policy and Procedures, 57 Fed. Reg. 43180, 43208 (Sept. 18, 1992).

such a relationship exists, the degree of the potential effect of a proposed action on these resource conditions." *Id.*

The Forest Service developed the new "extraordinary circumstances" provision in response to "[p]ublic and employee confusion" and court decisions which had interpreted the previous rules to require preparation of an EIS whenever any condition was present. *See* 67 Fed. Reg. at 54623-24; *see also Jones v. Gordon*, 792 F.2d 821, 828 (9th Cir. 1986) (holding that because the elements of the extraordinary circumstances provision were in the disjunctive, "if any of the elements is present, the Service must prepare an environmental assessment or an environmental impact statement").

## C. Eldorado and Lassen Projects

The Sierra Club challenged the application of the Fuels CE to three projects scheduled for 2004 in the Eldorado National Forest — the Grey Eagle Fuels Reduction Project (logging 984 acres and prescribed burning 4,149 acres), the Forest Guard Fuels Reduction Project (logging and prescribed burning 412 acres), and the Rockeye Fuels Reduction Project (logging and prescribed burning 513 acres). The Sierra Club also challenged one project in the Lassen National Forest, the Adams Windthrow Fuels Reduction Project (wind thrown tree removal on 760 acres), but withdrew its challenge to that project at a motions hearing in the district court after the Forest Service decided not to proceed with the project. However, as the Forest Service has other Fuels CE projects planned for the Lassen National Forest, the Sierra Club on appeal continues to challenge the application of the Fuels CE to the Lassen National Forest.

According to the most recent schedule of proposed actions, the Forest Service has fifteen or more Fuels CE projects planned for the Eldorado National Forest, covering more than 8,000 acres, U.S. Forest Serv., Schedule of Proposed Actions 4/1/2007 - 6/30/2007 Eldorado National Forest, *available at*

http://www.fs.fed.us/sopa/components/reports/sopa-110503-2007-04.pdf, and seven projects planned under the Fuels CE for the Lassen National Forest, U.S. Forest Serv., Schedule of Proposed Actions 4/1/2007 - 6/30/2007 Lassen National Forest, *available at* http://www.fs.fed.us/sopa/components/reports/sopa-110506-2007-04.pdf.

## D.   District Court Decision

The Sierra Club filed the instant action challenging the Fuels CE and seeking a nationwide injunction enjoining use of the Fuels CE. In its amended complaint, the Sierra Club alleged that the Fuels CE is invalid because (1) the CE inappropriately includes activities that have significant effects; (2) data underlying the Fuels CE did not support promulgation of the CE; (3) the Forest Service did not adequately identify activities covered by the CE; and (4) the Forest Service did not adequately determine there were no "extraordinary circumstances" under which the CE would not be appropriate. The Sierra Club also asserted that the Forest Service violated NEPA by failing to prepare an EA/FONSI or an EIS for the Fuels CE, and that the Fuels CE was incorrectly applied to the four projects in the Eldorado and Lassen National Forests.

On August 19, 2005, the district court granted the Sierra Club's motion to supplement the record with declarations from three of its experts, Craig Thomas, Dr. Denis Odion, and Monica Bond, but struck portions of the Thomas declaration. In the same ruling, the district court granted summary judgment in favor of the Forest Service.

The district court found that, in accordance with the Seventh Circuit's decision in *Heartwood, Inc. v. United States Forest Service*, 230 F.3d 947, 954 (7th Cir. 2000), the Forest Service is not required to produce an EIS or an EA prior to promulgating a CE. The district court found that the Sierra Club had not demonstrated that the Forest Service's methodology was irrational or that its reliance on its own expert opin-

ions was misplaced. The district court also found that the Forest Service had adequately determined and documented that no extraordinary circumstances existed in the four projects which would trigger the requirement for an EA or EIS and that the proposed fuels treatment did not increase fire risk. The district court entered summary judgment in favor of the Forest Service, and this appeal followed.

## II   Standards of Review

We review a grant of summary judgment de novo, viewing the decision of the Forest Service from the same position as the district court. *Nev. Land Action Ass'n v. U.S. Forest Serv.*, 8 F.3d 713, 716 (9th Cir. 1993). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

## A.   Challenge to Application of Fuels CE to Eldorado and Lassen National Forest

The Sierra Club and the Forest Service agree that the Administrative Procedure Act's (APA) arbitrary and capricious standard applies to the Sierra Club's challenge to the Fuels CE's application to the Eldorado and Lassen National Forest projects. "An agency's determination that a particular action falls within one of its categorical exclusions is reviewed under the arbitrary and capricious standard." *Alaska Ctr.*, 189 F.3d at 857.

Under the APA, a court may set aside an agency action if the court determines that the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also Marsh*, 490 U.S. at 375-77 (arbitrary and capricious standard applies to agency findings which involve agency expertise). "Although this inquiry

into the facts is to be searching and careful, the ultimate standard of review is a narrow one." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Under this deferential standard, we are "not empowered to substitute [our] judgment for that of the agency." *Id.* Consequently, we may reverse the decision as arbitrary or capricious only

> if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation that ran counter to the evidence before the agency, or offered one that is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*W. Radio Servs. Co. v. Espy*, 79 F.3d 896, 900 (9th Cir. 1996).

Nevertheless, to withstand review "[t]he agency [ ] must articulate a rational connection between the facts found and the conclusions reached." *Earth Island Inst. v. U.S. Forest Serv.*, 442 F.3d 1147, 1156-57 (9th Cir. 2006). We will defer to an agency's decision only if it is "fully informed and well-considered," *Save the Yaak Comm. v. Block*, 840 F.2d 714, 717 (9th Cir. 1988) (internal quotation marks omitted), and we "will disapprove of an agency's decision if it made 'a clear error of judgment,' " *West v. Sec'y of Dep't of Transp.*, 206 F.3d 920, 924 (9th Cir. 2000) (quoting *Marsh*, 490 U.S. at 378). Furthermore, when an agency has taken action without observance of the procedure required by law, that action will be set aside. *Idaho Sporting Cong., Inc. v. Alexander*, 222 F.3d 562, 567-68 (9th Cir. 2000).

## B.   Challenge to the Fuels CE

The Forest Service argues that the proper standard of review for the Sierra Club's challenge to the Fuels CE itself

is the "no set of circumstances" standard of review for facial challenges to statutes, as that standard was established by the Supreme Court in *United States v. Salerno*, 481 U.S. 739, 745 (1987), and extended by the Court in *Reno v. Flores*, 507 U.S. 292, 301 (1993), to agency regulations reviewed for inconsistency with the authorizing statute. Under the "no set of circumstances" test, the Sierra Club would have to establish "that no set of circumstances exists under which the regulation would be valid." *Akhtar v. Burzynski*, 384 F.3d 1193, 1198 (9th Cir. 2004) (citing *Reno*, 507 U.S. at 301). The Sierra Club, on the other hand, contends that the proper standard of review is the "arbitrary and capricious" standard generally applied to agency actions.

Jurisprudence appears to be divided on the question whether the *Salerno* "no set of circumstances" standard is dicta or whether it is to be generally applied to facial challenges.[4]

---

[4]*See, e.g., City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999) (plurality opinion) ("To the extent we have consistently articulated a clear standard for facial challenges, it is not the *Salerno* formulation, which has never been the decisive factor in any decision of this Court."); *Washington v. Glucksberg*, 521 U.S. 702, 740 (1997) (Stevens, J., concurring) (commenting on Court's failure to apply *Salerno* standard even though challenge to assisted suicide ban was facial challenge, and stating that "I do not believe the Court has ever actually applied such a strict standard, even in *Salerno* itself" (footnote omitted)); *Janklow v. Planned Parenthood, Sioux Falls Clinic*, 517 U.S. 1174, 1175 (1996) (Stevens, J., concurring in denial of cert.) (stating that *Salerno* "no set of circumstances" standard "does not accurately characterize the standard for deciding facial challenges," and that this "rigid and unwise dictum has been properly ignored in subsequent cases even outside the abortion context"); *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 895 (1992) (statute facially invalid as "substantial obstacle" to exercise of right in "large fraction" of cases); *id.* at 972-73 (Rehnquist, C.J., concurring in judgment in part and dissenting in part) (arguing that "no set of circumstances" dictum should have led to different result); *Kraft Gen. Foods, Inc. v. Iowa Dep't of Revenue & Fin.*, 505 U.S. 71, 82-83 (1992) (Rehnquist, C.J., dissenting) (arguing that tax statute was facially valid because it would be constitutional under certain facts); *Bowen v. Kendrick*, 487 U.S. 589, 602 (1988) (statute facially invalid under Establishment Clause only if, *inter alia*, law's "primary

We have mentioned the "no set of circumstances" standard in only one published opinion, *Akhtar v. Burzynski*, where we stated the standard and cited *Reno*, but did not discuss or apply it. 384 F.3d at 1198. On the other hand, we have on many occasions applied the *Chevron* test to facial challenges to agency regulations with no mention of the "no set of circumstances" test. *See, e.g.*, *Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, 877-78 (9th Cir. 2005); *Cal. ex. rel. Lockyer v. Fed. Energy Regulatory Comm'n*, 383 F.3d 1006, 1011-13 (9th Cir. 2004); *Envtl. Def. Ctr., Inc. v. U.S. Envtl. Prot. Agency*, 344 F.3d 832, 854-55 (9th Cir. 2003); *see also Babbitt v. Sweet Home Chapter*, 515 U.S. 687, 703-04 (1995).

Apart from our general absence of application of the "no set of circumstances" standard, we are not convinced that it should be applied to agency procedures such as the categorical exclusions in the present case. Indeed, the first circuit court to address a facial attack on a Forest Service categorical exclusion, *Heartwood, Inc. v. United States Forest Service*, 230 F.3d at 953, applied the "arbitrary and capricious" standard of review under the APA, 5 U.S.C. § 706. *See also Cellular Phone Taskforce v. F.C.C.*, 205 F.3d 82, 93-94 (2d Cir. 2000) (applying arbitrary and capricious standard of review to facial challenge to CE established by the FCC).[5]

We need not decide, however, whether *Salerno*'s "no set of circumstances" standard is the proper standard of review for

---

effect" is advancement of religion, or if it requires "excessive entanglement" between church and state); *id.* at 627 n.1 (Blackmun, J., dissenting) (pointing out and agreeing with majority's rejection of "no set of circumstances" dictum); Michael C. Dorf, *Facial Challenges to State and Federal Statutes*, 46 Stan. L. Rev. 235, 236, 238 (1994).

[5]We note that the Tenth Circuit in *Colorado Wild v. United States Forest Service*, 435 F.3d 1204, 1214 (10th Cir. 2006), applied the *Salerno* "no set of circumstances" review to a facial challenge to a Forest Service categorical exclusion.

facial challenges to agency procedures, because even if we were to apply that standard in this case, it would not benefit the Forest Service. If the Forest Service failed to comply with the procedures required under NEPA in promulgating the Fuels CE, then its procedural noncompliance would render the Fuels CE unlawful regardless of how the CE is applied. The invalidity of the CE flows from the NEPA violation, not from the application of the CE. Moreover, our review of the validity of the promulgation of the CE is based upon only the evidence available to the agency at the time the agency made the decision to adopt the CE. *See Overton Park*, 401 U.S. at 419-20 (directing federal courts to base review on full administrative record before the agency at time decision was made). In other words, if the Sierra Club's claims have merit, the stricter *Salerno* standard is met and there would be no set of circumstances under which the Fuels CE could be valid because the Forest Service failed to comply with NEPA.

## III   Discussion

### A.   Preparation of an EIS or an EA/FONSI

Although an agency need not prepare an EIS or an EA if an individual action falls under a valid categorical exclusion, the Sierra Club argues that the promulgation of the new Fuels categorical exclusion itself requires an EIS or an EA/FONSI because it is a major federal action which has a significant impact on the environment. *See* 42 U.S.C. § 4332(C).

The Sierra Club contends that the Fuels CE is a major federal action because it qualifies as a rule, which is defined under the APA as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency." 5 U.S.C. § 551(4). Rules are federal actions under the regulations published by the CEQ. 40 C.F.R. § 1508.18(a) (stating that federal actions include "new

or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals"). Even if the Fuels CE is not a rule, regulation, or procedure, the Sierra Club alternatively argues that it would fall under the major federal action definition of a "program," *see* 40 C.F.R. § 1508.18(b)(3), because it implements and carries out the policy of the President's Healthy Forests Initiative.

[1] The flaw in the Sierra Club's argument is that a categorical exclusion is by definition not a major federal action because the CEQ regulations define it to be "a category of actions which do not individually or cumulatively have a significant effect on the human environment and which have been found to have no such effect." 40 C.F.R. § 1508.4. The CEQ regulations also explicitly state that for this "category of actions," no EIS or EA is required. *Id.*

Accordingly, the one court to address this issue, the Seventh Circuit in *Heartwood*, determined that because categorical exclusions "by definition, do not have a significant effect on the quality of the human environment," the promulgation of a new categorical exclusion does not require issuance of an EIS or an EA/FONSI. 230 F.3d at 954; *see also* Daniel R. Mandelker, *NEPA Law & Litigation* 7:10 (2d ed. 2003) ("Consultation with CEQ on the adoption of categorical exclusions is required, but a categorical exclusion adoption does not require an environmental assessment or an impact statement."). The Sierra Club's attempt to distinguish *Heartwood* on the basis that the categorical exclusion at issue here differs in significance is unavailing because the court in *Heartwood* based its holding on the regulatory definition of categorical exclusion, not on the substance of the specific categorical exclusion at issue. 230 F.3d at 954-55.

[2] Moreover, the promulgation of a categorical exclusion is an implementing procedure of the CEQ regulations, regulations which do not require an EA/FONSI prior to promulgation of a CE. The CEQ regulations require agencies to

establish "agency procedures" that include "specific criteria for and identification of those typical classes of action . . . which normally do not require either an environmental impact statement or an environmental assessment." 40 C.F.R. § 1507.3(b). However, no EIS or EA/FONSI need be produced prior to promulgation of a CE; rather, the agency need only "consult with the Council while developing its procedures and before publishing them in the Federal Register for comment" and adopt procedures "only after an opportunity for public review and after review by the Council for conformity with the Act and these regulations." *Id.* § 1507.3(a). We therefore agree with the Seventh Circuit that "[f]or these procedures, the CEQ does not mandate that agencies conduct an EA before classifying an action as a CE and we must give great deference to the CEQ's interpretation of its own regulations." *Heartwood*, 230 F.3d at 954 (citing *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979)).

In addition, the decision not to produce an EIS or an EA when promulgating a CE is not a change in the Forest Service's policy. Significantly, although the Sierra Club argues that for more than 20 years EISs have been required for rules and regulations, the Sierra Club points to no prior instance where an agency has produced an EA/FONSI to accompany promulgation of a new CE. None of the cases in which plaintiffs have challenged a CE itself made mention of an EA/FONSI preceding the establishment of the CE. *See, e.g., Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1211-14 (10th Cir. 2006); *Cellular Phone Taskforce*, 205 F.3d at 93-94; *Heartwood*, 230 F.3d at 954.

Rather than require the Forest Service to produce an EIS or an EA/FONSI, which the CEQ regulations do not require when the Forest Service promulgates a CE, we will examine the record to determine whether the evidence supports the Forest Service's determination that the identified category of actions in the Fuels CE do not individually or cumulatively have a significant impact on the environment. *See* Mandelker,

*NEPA Law & Litigation* § 7:10 ("The effect of this method of defining categorical exclusions is to apply the same criteria for determining whether an impact statement is necessary to the categorical exclusion decision.").

## B.   Fuels CE not in compliance with NEPA

We conclude that because the Forest Service failed to demonstrate that it made a "reasoned decision" to promulgate the Fuels CE based on all the relevant factors and information, its promulgation of the Fuels CE was arbitrary and capricious. *Marsh*, 490 U.S. at 378; *see also* 40 C.F.R. § 1505.1. "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr.*, 189 F.3d at 859. The Service erred by conducting the data call as a post-hoc rationale for its predetermined decision to promulgate the Fuels CE, failing to properly assess significance, failing to define the categorical exclusion with the requisite specificity, and therefore basing its decision on an inadequate record.

### 1.   Improper Post-Hoc Decision-Making

[3] The Department of the Interior and the Forest Service inappropriately decided to establish a categorical exclusion for hazardous fuels reduction before conducting the data call. In requesting the data call, the Deputy Chief of the Forest Service stated that the Forest Service "intend[s] to put this information to good use supporting a categorical exclusion for fuels treatment, rehab and salvage." Post-hoc examination of data to support a pre-determined conclusion is not permissible because "[t]his would frustrate the fundamental purpose of NEPA, which is to ensure that federal agencies take a 'hard look' at the environmental consequences of their actions, early enough so that it can serve as an important contribution to the decision making process." *California v. Norton*, 311 F.3d 1162, 1175 (9th Cir. 2002) (citation omitted). "[P]ost-decision information [ ] may not be advanced as a new ratio-

nalization either for sustaining or attacking an agency's decision." *Sw. Ctr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1450 (9th Cir. 1996).

Moreover, the Forest Service failed to engage in the required "scoping process" prior to establishment of the categorical exclusion in order to " 'determine the scope of the issues to be addressed and for identifying the significant issues related to a proposed action.' " *Alaska Ctr.*, 189 F.3d at 858 (quoting 40 C.F.R. § 1501.7); *see also* FSH § 1909.15, ch. 30.3. In determining the "scope" of a proposed project, the responsible Forest Service officer is required to consider the cumulative impacts of connected, cumulative, and similar actions, and is required to produce an EA if the proposed project may have a significant effect on the environment. *See* FSH § 1909.15, ch. 30.3; 40 C.F.R. § 1508.25(a)(3).

**[4]** As the CEQ regulations state, NEPA procedures constitute the framework decisional process, and "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action." 40 C.F.R. § 1500.1(c). The determination that a categorical exclusion was the proper path to take should have taken place *after* scoping, reviewing the data call, and determining that the proposed actions did not have individually or cumulatively significant impacts.

## 2. Failure to properly assess significance

"Categorical exclusions, by definition, are limited to situations where there is an insignificant or minor effect on the environment." *Alaska Ctr.*, 189 F.3d at 859; *see also* 40 C.F.R. § 1508.4. The Forest Service must document that the action to be undertaken is insignificant because the "threshold question in a NEPA case is whether a proposed project will 'significantly affect' the environment, thereby triggering the requirement for an EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998) (citing 42 U.S.C. § 4332(2)(c)). The Forest Service did not do this. It

failed to consider adequately the unique characteristics of the applicable geographic areas, the degree to which effects on the quality of the environment were controversial or the risks were unknown, the degree to which the CEs might establish a precedent for future actions with significant effects or represented a decision in principle about future considerations, the degree to which the actions might affect endangered species, and whether there existed cumulative impacts from other related actions. 40 C.F.R. § 1508.27(b).

### a.   Cumulative Impacts

**[5]** The Forest Service concedes that no cumulative impacts analysis was performed for the Fuels CE as a whole. The Forest Service must perform this impacts analysis prior to promulgation of the CE. *See* 40 C.F.R. § 1508.4. "[C]umulative impact analysis must be timely. It is not appropriate to defer consideration of cumulative impacts to a future date when meaningful consideration can be given now." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1075 (9th Cir. 2002) (citing *Neighbors of Cuddy Mountain*, 137 F.3d at 1380).

That the Forest Service may perform an impacts analysis at the project level does not relieve it of its obligation to ensure that the Fuels CE as a whole has no cumulative impacts. Relying solely on a project level analysis is inadequate because it fails to consider impacts from past, present, or reasonably foreseeable future Fuels CE projects which may be located in close proximity, in the same watershed or endangered species habitat area. The CEQ regulations define "cumulative impact" as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.

40 C.F.R. § 1508.7. The regulations further state that "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* The record of decision must contain a "useful analysis of the cumulative impacts of past, present, and future projects," which requires "discussion of how [future] projects together with the proposed . . . project will affect [the environment]." *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 810 (9th Cir. 1999) (internal quotation marks omitted) (alterations in original).

Moreover, "NEPA [ ] prohibit[s] an agency from breaking up a large or cumulative project into smaller components in order to avoid designating the project a major federal action" that would be subject to NEPA analysis requirements. *Churchill County v. Norton*, 276 F.3d 1060, 1076 (9th Cir. 2001) (internal quotation marks omitted). As the Sierra Club points out, if assessing the cumulative impacts of the Fuels CE as a whole is impractical, then use of the categorical exclusion mechanism was improper. *Cf. Nat'l Parks & Conservation Ass'n*, 241 F.3d at 733 ("[T]he Parks Service's repeated generic statement that the effects are unknown does not constitute the requisite 'hard look' mandated by the statute if preparation of an EIS is to be avoided.").

**[6]** That an impacts analysis be done is of critical importance in a situation such as here, where the categorical exclusion is nationwide in scope and has the potential to impact a large number of acres. While dependent on the risk of wildfire, the Fuels CE could potentially be applicable beyond the wildland-urban interface to all units of the national forest system, totaling 192 million acres of land within 155 national forests and 20 national grasslands. National Forest System Land and Resource Management Planning, 65 Fed. Reg. 67514, 67514 (Nov. 9, 2000). The final notice published in the federal registry for the Fuels CE states that the projects surveyed represent a reasonable projection of its future use, 68 Fed. Reg. at 33815, which, at 2.5 million acres over 2

years, would exceed 1.2 million acres per year treated under the Fuels CE.

The Forest Service's assertion that the Fuels CE is not a nationwide program that would necessitate a cumulative impacts analysis because it has no immediate direct effects is disingenuous; the Fuels CE is precisely a nationwide program that was designed to implement the 10-year plan in a way that avoids the need for production of EIS's or EAs. And, as demonstrated by the number of projects already planned or approved in just the Eldorado and Lassen National Forests, actions directly affecting the environment are being taken under the Fuels CE. In addition, as the Sierra Club points out, we rejected similar arguments regarding the hypothetical nature of causation in *Citizens for Better Forestry v. U.S. Dep't of Agric.*, 341 F.3d 961, 973-75 (9th Cir. 2003), and *Kootenai Tribe of Id. v. Veneman*, 313 F.3d 1094, 1115 (9th Cir. 2002). An environmental analysis must be performed even for broad programmatic actions. *See* 40 C.F.R. § 1502.4(b); *cf. Nat'l Parks & Conservation Ass'n*, 241 F.3d at 733-34; *Blue Mountains Biodiversity Project*, 161 F.3d at 1213.

**[7]** Although the record does contain a report from the Department of Interior summarizing the results of the data call, this report is inadequate as a cumulative impacts analysis because it offers only conclusory statements that there would be no significant impact. *Cf. Muckleshoot*, 177 F.3d at 811 ("While the district court was correct in observing that there are 'twelve sections entitled cumulative effects,' these sections merely provide very broad and general statements devoid of specific, reasoned conclusions."). The Forest Service does not reveal its methodology or offer any quantified results supporting its conclusory statements that there are no cumulative impacts — it argues only that through the exercise of its expertise it determined that there was no such impact. This is insufficient. *See Klamath-Siskiyou Wildlands Ctr. v. B.L.M.*, 387 F.3d 989, 993 (9th Cir. 2004) ("A proper consid-

eration of the cumulative impacts of a project requires some quantified or detailed information." (internal quotation marks omitted)). Moreover, the cumulative impacts analysis cannot focus only on the beneficial effects of hazardous fuels management in terms of controlling forest fires, but must also analyze the effects on the environment as a whole. *Cf. Muckleshoot*, 177 F.3d at 811 ("The statement notably contains no evaluation whatsoever of the impact on natural resources of timber harvesting . . . , nor does it assess the possible impacts . . . upon surrounding areas. The statement focuses solely on the beneficial impact the exchange will have on lands received by the Forest Service.").

For example, in assessing the effects on air quality from prescribed burning, the report states that "a review of the project data showed that these environmental effects were not individually or cumulatively significant." No hard data is provided to support this conclusion. There is no information on how effects on air quality will be mitigated nor does the documentation explicitly state with which policies or smoke management plans the actions taken under the Fuels CE must comply.

Furthermore, the report reveals potential significant effects, such as effects on soil and water quality from mechanical treatments, thinning operations, fire rehabilitation activities, and temporary road construction. The report also notes that seventy-four of the fuels projects in the data call resulted in temporary increases in erosion, localized sterilization of soil, and sedimentation of water quality. Nevertheless, the report summarily concludes, without citing hard data to support its conclusion, that there were no cumulative impacts because the effects were "localized, temporary, and of minor magnitude." Yet this is precisely the reason why a global cumulative impacts analysis must be performed — if multiple Fuels CE projects are located in close proximity, then the effects on soil and water quality could no longer be said to be localized or of minor magnitude. In addition, the report reveals effects on

wildlife and vegetation. The effects include displacement of wildlife from noise and activity caused by mechanized equipment, and habitat modification (changes in food sources, thermal and hiding cover) from changes in vegetation composition, invasive weed species, and reduced vegetation density.

**[8]** Although the report lists potential mitigation measures, actions taken under a categorical exclusion do not require mitigation measures and the Fuels CE itself does not prescribe such measures. In addition, while significant mitigation measures may compensate for adverse environmental effects, the mitigation measures here are not "developed to a reasonable degree" and lack supporting analytical data. *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 734 (internal quotation marks omitted); *cf. Okanogan Highlands Alliance v. Williams*, 236 F.3d 468, 473-75 (9th Cir. 2000) (in analyzing mitigation measures, the Forest Service conducted computer modeling to predict the quality and quantity of environmental effects, discussed the monitoring measures to be put in place, ranked the probable efficacy of the different measures, detailed steps to achieve compliance should the measures fail, and identified the environmental standards by which mitigation success could be measured).

In order to assess significance properly, the Forest Service must perform a programmatic cumulative impacts analysis for the Fuels CE. The cumulative impacts analysis cannot merely consist of conclusory statements, because "[g]eneral statements about 'possible' effects and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided." *Neighbors of Cuddy Mountain*, 137 F.3d at 1380. "The cumulative impact analysis must be more than perfunctory; it must provide a 'useful analysis of the cumulative impacts of past, present, and future projects.'" *Kern*, 284 F.3d at 1075 (quoting *Muckleshoot*, 177 F.3d at 810); *see also Heartwood, Inc. v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 976 (S.D. Ill. 1999), *aff'd*,

230 F.3d 947 (7th Cir. 2000) (vacating and enjoining application of timber harvest CE, in part because the "[Forest Service] failed to adequately address or provide support for its position that the timber harvests of these magnitude would not have cumulative effects on the environment").

The impacts analysis must also contain "some quantified or detailed information." *Neighbors of Cuddy Mountain*, 137 F.3d at 1379; *see also Norton*, 311 F.3d at 1177-78 (concluding that government needed to better document application of CE to oil lease suspensions that allowed oil companies to maintain production rights). "Agency regulations require that public information be of 'high quality' because [a]ccurate scientific analysis, expert agency comments, and *public scrutiny* are essential to implementing NEPA." *Idaho Sporting Cong.*, 137 F.3d at 1151 (internal quotation marks omitted) (emphasis in original).

**[9]** In accordance with the CEQ regulations, to assess significance and measure context and intensity, the Forest Service must assess cumulative impacts on a programmatic level. While "[w]e recognize that the determination of the extent and effect of [cumulative impact] factors, and particularly identification of the geographic area within which they may occur, is a task assigned to the special competency of the appropriate agencies," *Blue Mountains Biodiversity Project*, 161 F.3d at 1215, the Forest Service must ensure that impacts are assessed at a level of detail such that useful data can be generated to facilitate review. *See* 40 C.F.R. §§ 1502.4(b), 1508.27. The Forest Service must also consider the impacts on wildlife and wildlife habitat. *Cf. Heartwood*, 73 F. Supp. 2d at 976 (vacating and enjoining application of the timber harvest CE, in part because the Forest Service "did not distinguish between the environmental effects of live trees harvests and salvage sales . . . and, in fact, failed to address the issue of potential negative effects on wildlife at all").

At this point, the Forest Service has a wealth of data that it could review to determine cumulative impacts, including

the projects in the data call, the projects already undertaken pursuant to the Fuels CE, and reasonably foreseeable future projects. *See* 40 C.F.R. §§ 1508.7, 1508.27; *Muckleshoot*, 177 F.3d at 811-12 ("An agency must analyze the incremental impact of the action when added to other past, present, and *reasonably foreseeable* future actions." (internal quotation marks omitted) (emphasis in original)). This would address the assertion that the projects in the data call are not comparable to those taken under the CE because the data call projects were for the most part subject to mitigation measures.

### b.  Highly Controversial and Risks Uncertain

**[10]** The Forest Service also erred in assessing significance by failing to consider the extent to which the impact of the fuels reduction projects on the environment was highly controversial and the risks uncertain. *See* 40 C.F.R. § 1508.27; *Jones*, 792 F.2d at 828. A proposal is highly controversial when "substantial questions are raised as to whether a project . . . may cause significant degradation of some human environmental factor," *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 1536 (9th Cir. 1997) (internal quotation marks omitted), or there is a "substantial dispute [about] the size, nature, or effect of the major Federal action," *Blue Mountains Biodiversity Project*, 161 F.3d at 1212 (alteration in original) (internal quotation marks omitted). "A substantial dispute exists when evidence, raised prior to the preparation of an EIS or FONSI, casts serious doubt upon the reasonableness of an agency's conclusions." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736 (citation omitted).

**[11]** Here, the comments of several federal and state agencies submitted in response to the Fuels CE raised substantial questions as to whether the project would cause significant environmental harm and expressed serious concerns about the uncertain risk, size, nature, and effects of actions under the CE. The United States Fish and Wildlife Service ("FWS") stated that reconstruction of decommissioned roads or cre-

ation of temporary roads could increase road density, decrease wolf security habitat and grizzly bear core area, and contribute to increased sedimentation rate in streams. The FWS further questioned the need for a categorical exclusion, stating that it "supports the intent of the Healthy Forest Initiative, but believes the existing NEPA processes are a useful and necessary tool to analyze the full environmental effects of most hazardous fuels reduction projects." The FWS also expressed concern that "efforts to streamline these analyses should not results [sic] in a process counter to the basic premise of NEPA — public disclosure."

The Arizona Game and Fish Department ("AGFD") noted that fuel reduction activities have a higher likelihood of affecting the environment than rehabilitation/stabilization activities, yet the Forest Service data call does not adequately identify the nature or scope of individual projects to allow for a more detailed evaluation. AGFD pointed out that a recent Forest Service timber sale proposed as a means to reduce fuel loading provided for the cutting of large-diameter ponderosa pine trees, even though ponderosa pine is a fire-resistant tree species. AGFD also disputed the Forest Service's determination that the Fuels CE would cause no significant impacts and identified five of the ten evaluation criteria for significance that are implicated by the Fuels CE, including highly uncertain risks on forest structure, wildlife species, exotic species invasion, erosion/sedimentation, and wildlife disease transmission.

The AGFD further commented that it was "concerned about making hazardous fuels reduction and rehabilitation/ stabilization actions for categorical exclusion." The AGFD expressed other concerns, including: "the types of activities that will be categorically excluded; the lack of limitations on the scope and scale of such activities; the lack of monitoring of effects of the categorical exclusions on non-listed wildlife species and habitats; and the over-all general nature of the categorical exclusion language."

The California Resources Agency ("CRA") commented that the Forest Service has not evaluated the impacts of understory treatments on native plants and animals, and noted that the brush to be removed in California under fuels reduction is a significant component of fire-adapted ecosystems. The CRA also cited a scientific article which finds that the effects of thinning on wildlife and habitat are negative for at least 10 years, and unknown in the long-term. The CRA concluded that "[a] significant amount of uncertainty regarding the effectiveness of treatments on reduced risk and habitat use remain."

In addition, the CRA expressed disapproval of the use of a categorical exclusion not requiring full NEPA review, concluding that "the proposal could lead to significant degradation of public forestland in the state, especially when considered in combination with the many other federal forest policy proposals pending on both the state and regional levels." The CRA explained that "[f]uel reduction projects will require trade-offs that need analysis and debate by the public and decision-makers; and this is the very purpose for which Congress passed, and President Nixon signed, the National Environmental Policy Act."

**[12]** The Forest Service failed to meet its burden to provide a "well-reasoned explanation" demonstrating that these responses to the Fuels CE "do not suffice to create a public controversy based on potential environmental consequences." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 736 (internal quotation marks omitted). Given the large number of comments, close to 39,000, and the strong criticism from several affected Western state agencies, we cannot summarily conclude that the effects of the Fuels CE are not controversial. *See id.* (stating that 450 comments, with 85% negative, was "more than sufficient to meet the outpouring of public protest" test (internal quotation marks omitted)); *Sierra Club v. U.S. Forest Serv.*, 843 F.2d 1190, 1193 (9th Cir. 1988) (Forest Service awarded timber contracts containing groves of giant

sequoia redwoods without preparing an EIS; after evidence from numerous experts showing the EA's inadequacies and casting serious doubt on the Forest Service's conclusions, we held that this was "precisely the type of 'controversial' action for which an EIS must be prepared"). The Forest Service must address these issues prior to promulgating the Fuels CE.

## 3.   Requisite Specificity

[13] The CEQ regulations require that agency procedures on categorical exclusions include "[s]pecific criteria for and identification of those typical classes of action . . . [w]hich normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4))." 40 C.F.R. § 1507.3(b)(2).  Although the Department of Interior report revealed that twelve of the fuels treatment projects in the data call had individually or cumulatively significant effects, it neglected to identify what specific characteristics of those projects made those effects significant. The report also listed other effects, which, although deemed "localized" or "temporary" in the projects analyzed, could conceivably have a cumulative effect if multiple Fuels CE projects were located in close proximity.  The Fuels CE as written lacks the requisite specificity to ensure that the projects taken under it achieve the objective of hazardous fuels reduction, but do not individually or cumulatively inflict a significant impact. *See* 40 C.F.R. § 1508.4. The Service must take specific account of the significant impacts identified in prior hazardous fuels reduction projects and their cumulative impacts in the design and scope of any future Fuels CE so that any such impacts can be prevented.

For example, the Fuels CE fails to identify the maximum diameter or species of trees that are permitted to be logged and, as the AGFD noted, allows for removal of trees, such as the ponderosa pine, which are fire resistant. There is also no limit on the proximity of different projects under the Fuels CE, nor any cap on the number of projects in a particular

watershed, ecosystem, or endangered species habitat area. The Fuels CE also lacks any restrictions on the thinning of trees or the removal of combustible vegetation, and, as AGFD points out, livestock grazing could potentially be categorically excluded as removal of combustible vegetation, even though grasses in most instances are not considered hazardous fuels.

There are also no provisions for identifying when temporary road removal is required, what road density is permitted, or even a definition of what types of roads qualify as "temporary" roads. As the FWS points out, road density has significant effects on several endangered species, as well as aquatic habitats and stream sedimentation. The FWS also notes that " 'adverse effect,' as it pertains to extraordinary circumstances that may exempt a project from the proposed categorical exclusions," is not defined and "may have different meanings for each agency."[6]

## IV　Remedy

[14] In declaring that no significant environmental effects were likely without complying with the requirements of NEPA, the Forest Service's decision-makers made a "clear error of judgment." *Marsh*, 490 U.S. at 378. Having determined that the district court erred in granting summary judgment, we turn to the question of what remedy is appropriate.

The Sierra Club has made the requisite showing for injunctive relief because "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is

---

[6]Further specification and definition of what actions are permitted under the Fuels CE based on the results of the programmatic cumulative impacts analysis will reduce reliance on the current case-by-case approach necessitated by the Fuels CE. Because the CEQ regulations require that the Forest Service enact provisions for extraordinary circumstances, some analysis of impacts at the project level will always be necessary. Therefore we need not address the Sierra Club's argument that the current approach creates an unlawful case-by-case exception to NEPA.

often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). Moreover, "[i]f environmental injury is sufficiently likely, the balance of harms will usually favor the issuance of an injunction to protect the environment." *High Sierra Hikers Ass'n v. Blackwell*, 390 F.3d 630, 642 (9th Cir. 2004) (citing *Amoco*, 480 U.S. at 545). While a violation of NEPA does not automatically require the issuance of an injunction, "the presence of strong NEPA claims gives rise to more liberal standards for granting an injunction." *Am. Motorcyclist Ass'n v. Watt*, 714 F.2d 962, 965 (9th Cir. 1983). "When the proposed project may significantly degrade some human environmental factor, injunctive relief is appropriate." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 737 (internal quotation marks omitted).

The balance of equities and the public interest favor issuance of an injunction because allowing a potentially environmentally damaging program to proceed without an adequate record of decision runs contrary to the mandate of NEPA. *See Kootenai Tribe,* 313 F.3d at 1125 ("[W]here the purpose of the challenged action is to benefit the environment, the public's interest in preserving precious, unreplenishable resources must be taken into account in balancing the hardships."); *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 737. The public interest is further implicated because the prescribed burning and logging have potential impacts on air, soil, and water quality, and wildlife and forest resources. *See Earth Island*, 442 F.3d at 1177 ("The preservation of our environment, as required by NEPA and the NFMA, is clearly in the public interest."); *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1308 (9th Cir. 2003) ("[I]t is also appropriate to consider the broader public interest in the preservation of the forest and its resources."); *cf. High Sierra Hikers*, 390 F.3d at 643.

The Forest Service's failure to properly assess the significance of the Fuels CE, a broad programmatic action under

which in excess of 1.2 million acres will be annually logged and burned, causes irreparable injury, as "[i]n the NEPA context, irreparable injury flows from the failure to evaluate the environmental impact of a major federal action." *Id.* at 642. The harm is compounded by the "added risk to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with public comment) of the likely effects of their decision on the environment." *Citizens for Better Forestry*, 341 F.3d at 971 (quoting *West*, 206 F.3d at 930 n.14).

**[15]** However, in balancing the hardships, we must recognize that the challenged CE was promulgated in 2003 and many individual projects already have been approved and are in operational stages. The record before us does not show which projects have been completed or are substantially near completion. "[W]here the question of injunctive relief raise[s] intensely factual issues, the scope of the injunction should be determined in the first instance by the district court." *Nat'l Parks & Conservation Ass'n*, 241 F.3d at 738 (internal quotation marks omitted) (alteration in original). Therefore, we vacate the district court's summary judgment, and remand this case to that court with instructions to enter an injunction precluding the Forest Service from implementing the Fuels CE pending its completion of an adequate assessment of the significance of the categorical exclusion from NEPA. The injunction shall be limited to those projects for which the Forest Service did not issue approval prior to the initiation of this lawsuit in October 2004, but we leave to the district court the decision as to which projects approved after the lawsuit was filed are appropriate to exclude from the injunction because they are at or near completion.

**REVERSED AND REMANDED WITH INSTRUCTIONS**.

KLEINFELD, Circuit Judge, concurring:

I cannot bring myself to believe that a Forest Service decision to cut brush and use controlled burns to reduce forest fire danger near urban areas is arbitrary and capricious. And I cannot quite bring myself to believe that the categorical exclusion in this case, covering less than one half of one percent of federal land, will have a cumulative impact on our environment requiring years more research, analysis and report writing before we do anything to protect people from forest fires. As a matter of common sense, cutting brush and using controlled burns on parcels no larger than 1,000 acres and 4,000 acres respectively seems most likely to have the cumulative impact of reducing the catastrophic effect of forest fires on people.

Nevertheless, the government's brief does not point us to anything in the record that supports my intuitive view. The best I can find in the record is some scattered bits that were written after the categorical exclusion was made, saying that the categorical exclusion is not expected to contribute to adverse cumulative impacts on sensitive wildlife species. The briefs and record control, and the government has made no serious attempt to show us why the categorical exclusion was not arbitrary and capricious or that it gave the required "hard look" at the categorical exclusion before promulgating it. A judge's duty is to decide the case based on the law and the record, not his personal policy preference. I am therefore compelled to concur.